# UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHERN DIVISION

In the Matter of:

JOHN DARREN RICHARDSON  
SSN: XXX-XX-1676  
NATALIE T. RICHARDSON  
SSN: XXX-XX-1970  

        Debtor(s).

EVABANK

        Plaintiff(s),

v.

JOHN DARREN RICHARDSON

        Defendant(s).

CASE NO. 06-82561-JAC-7

CHAPTER 7

AP NO. 07-80025-JAC-7

**Memorandum Opinion**

On July 31, 2007, this case came before the Court on the parties' cross-motions for summary judgment. On June 29, 2007, EvaBank filed its motion for summary judgment and the affidavit of Phillip Crumbley, the senior vice president of EvaBank, in support thereof. The debtor's motion for summary judgment is supported by the depositions of the debtor and Phillip Crumbley.

EvaBank filed the above styled complaint to except debts totaling $23,079.38, plus interest, late charges and attorney's fees, from discharge on the grounds of "fraud, deceit, breach of contract and/or breach of fiduciary duty." At the hearing, the Court ruled, and EvaBank conceded as much, that the debtor was entitled to summary judgment as a matter

of law on the fraud counts asserted by EvaBank under § 523(a)(2) alleging false pretenses, false representation and actual fraud.

The issue was then narrowed to the remaining count in EvaBank's complaint seeking a determination that the debt owed to EvaBank is nondischargeable under 11 U.S.C. § 523(a)(4) as a debt for fraud or defalcation while acting in a fiduciary capacity. EvaBank asserts that the debtor was acting in a fiduciary capacity with regard to a mobile home which he "fraudulently sold, having agreed and undertaken to preserve and protect EvaBank's collateral interest."

The debtor is the vice president and a shareholder of Richardson Holdings, Inc. ("RHI"), a company in the business of purchasing and selling manufactured homes. In January of 2006, RHI d/b/a Repot Depot sold a 2004 Clayton mobile home to James and Brandy Vann. EvaBank financed the Vanns' purchase of the mobile home. Before taking possession of the home, the Vanns separated and defaulted on the mortgage. Thereafter, Phillip Crumbley contacted the debtor and asked if EvaBank could resell the mobile home from RHI's lot. RHI agreed to purchase the mobile home from EvaBank and resell same.

On March 28, 2006, RHI purchased the mobile home from EvaBank and EvaBank financed the purchase, lending RHI $21,016.5. The mobile home was given as security for the debt and the debtor personally guaranteed same. Unbeknownst to EvaBank, the debtor had sold half the business prior to RHI's purchase of the mobile home and was no longer actively involved in running the business.

On March 31, 2006, RHI sold the mobile home to a third party for $27,000, receiving a $500.00 down payment. On April 8, 2006, the purchasers paid RHI the balance owed by giving RHI a personal check. After RHI deposited the checks, RHI's secretary prepared a check to be sent to EvaBank once the deposit cleared RHI's account.

During this time period, the debtor explained in his sworn deposition that he no longer worked at RHI on a daily basis which was being operated by the debtor's business partner, Tom Collins. In January of 2006, the debtor had sold 50% of the business to Collins. In January of 2006, Collins became the president of RHI and the debtor was listed as the vice president. By March of 2006, the debtor had taken a consulting job with another company and was no longer working at RHI on a daily basis.

Although the debtor was no longer involved in the daily operations of the business, the debtor signed the check prepared by RHI's secretary for EvaBank. RHI's secretary called the debtor after RHI sold the mobile home and asked the debtor to come by and sign the title application as the debtor was the only one who could sign same because the debtor's designated agent number had been used for the transaction. While the debtor was there, the secretary asked the debtor to sign EvaBank's check. The debtor admits that he signed same and testified that he understood that Collins would release the check to EvaBank once the purchasers' personal checks cleared RHI's account. Instead, Collins at some point voided EvaBank's check.

Subsequently, Crumbley called the debtor to inquire about the mobile home and the debtor explained that the check had been cut. When Crumbley informed the debtor that

3

Case 07-80025-JAC    Doc 23    Filed 08/17/07    Entered 08/17/07 13:07:26    Desc Main
Document      Page 3 of 14

EvaBank had not received the check, the debtor contacted Collins to find out why the check had not be forwarded to EvaBank. The debtor subsequently discovered that RHI was overdrawn by $16,000 to $17,0000 when it sold the mobile home. When RHI deposited the checks for the mobile home into its operating account, the funds were used to cover the overdraft and continue business operations. This left insufficient funds in the account to pay EvaBank. Nevertheless, the debtor believed that Collins had incoming receivables that would take care of the check. However, by June of 2006, Collins had resigned and forfeited his interest in the business. After Collins resigned, the debtor learned exactly what remained outstanding. EvaBank never received any payment, principle or interest, on the loan.

After considering both motions for summary judgment, the responses and replies made thereto, the depositions and affidavits, and for the reasons discussed in open court and below, the Court finds that there is no genuine issue of material fact and that, pursuant to Fed.R.Civ.P. 56(c) and Fed.R.Bankr.P. 7056, summary judgment is due to be entered in favor of the debtor pursuant to 11 U.S.C. § 523(a)(4). Section 523(a)(4) of the Bankruptcy Code provides that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]

EvaBank asserts that the debtor, while acting in a fiduciary capacity, committed fraud or defalcation by selling the mobile home securing the bank's claim and failing to pay EvaBank. EvaBank argues that the debt arising from the debtor's failure, as an owner of

RHI, to use the sales proceeds to pay EvaBank is due to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4). Before the Court can find a debt nondischargeable for fraud or defalcation under this exception, the Court must find: (1) that a fiduciary relationship existed between the debtor and EvaBank; (2) that the debtor committed fraud or defalcation in the course of that fiduciary relationship, and (3) a resulting loss.[1]

The Eleventh Circuit construes the term "fiduciary capacity" for purposes of § 523(a)(4) more narrowly than the term is traditionally used in other circumstances.[2] In *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006), the Eleventh Circuit explained that the "Supreme Court has consistently held that the term 'fiduciary' is not construed expansively, but instead is intended to refer to 'technical' trusts."[3]

Citing its *Quaif v. Johnson* decision, the Eleventh Circuit explained that "constructive" or "resulting" trusts do not fall within the exception to discharge for debts for defalcation while acting in a fiduciary capacity:

> In *Quaif,* this Court further noted that the 1934 *Davis* decision is the last Supreme Court case to speak to the issue and that the Supreme Court has left "the lower courts to struggle with the concept of 'technical' trusts." *Quaif* also discussed the trends in judicial interpretation of the § 523(a)(4) exception and noted that courts seemed to include the voluntary, express trust created by contract within the scope of "fiduciary capacity" as used in § 523(a)(4). In contrast, courts have excluded the involuntary resulting or constructive trust, created by operation of law, from the scope of the exception. Additionally,

---

[1] *Board of Trustees v. Bucci (In re Bucci)*, 2007 WL 1891736 (6th Cir. 2007).

[2] *Guerra v. Fernandez-Rocha (In re Fernandez-Rocha)*, 451 F.3d 813, 816 (11th Cir. 2006).

[3] *Fernandez-Rocha*, 451 F.3d at 816 (quoting *Quaif v. Johnson*, 4 F.3d 950, 953 (11th Cir. 1993).

5

> *Quiaf* noted that cases have "also articulated a requirement that the trust relationship have existed prior to the act which created the debt in order to fall within the statutory [fiduciary capacity] exception." Accordingly, "constructive" or "resulting" trusts, which generally serve as a remedy for some dereliction of duty in a confidential relationship, do not fall within the § 523(a)(4) exception "because the act which created the debt *simultaneously* created the trust relationship.[4]

Accordingly, § 523(a)(4) applies only to those situations involving express or technical trust relationships.

Courts have found that statutorily-created trusts are technical trusts for purposes of § 523(a)(4). In *Quaif v. Johnson (In re Quaif)*, 4 F.3d 950 (11th Cir. 1993), the Eleventh Circuit focused on the relationship between the debtor and creditor for purposes of § 523(a)(4). The debtor, a licensed insurance agent, failed to remit insurance premiums collected on behalf of the insurer to same. The Georgia Code imposed a fiduciary duty on such agents to segregate all premiums in an account separate from the agents' personal funds and to promptly pay the premiums to the insurer. The Eleventh Circuit found that the debtor's duty to segregate premiums in an account separate from other types of funds was sufficient to establish that a statutorily-created or technical trust relationship existed between the debtor and the insurer prior to the debtor's act of defalcation.

EvaBank does not contend that the debtor owed the bank a statutorily created fiduciary duty. Rather, it contends generally that the debtor was acting in a fiduciary capacity with regard to the mobile home and asserts that the debtor fraudulently sold same

---

[4] *Fernandez-Rocha*, 451 F.3d at 816 (citation omitted).

"having agreed and undertaken to preserve and protect EvaBank's collateral interest." The debtor responds that EvaBank cannot satisfy its burden under § 523(a)(4) based merely on the default by the debtor's business in the payment of a secured debt, without more.

In *Davis v. Tomasek*, 175 Fed. Appx. 662 (5th Cir. 2006), the Fifth Circuit agreed with the bankruptcy court in finding that the debtor's sale of secured property without paying off the secured party, at most, amounted to a breach of contract claim. The secured creditors had no claim for defalcation because a defalcation claim requires a fiduciary relationship between the debtor and creditor, of which no evidence existed. The court of appeals cited a prior Fifth Circuit opinion explaining that a creditor-debtor relationship is not a fiduciary relationship.[5] At most, the debtor's actions constituted a breach of contract claim, not embezzlement or larceny, for purposes of § 523(a)(4).

In another case involving a sale of collateral and failure to remit proceeds, *Southwest State Bank v. Ellis (In re Ellis),* 310 B.R. 762 (Bankr. W.D. Okla. 2004), the bankruptcy court held that the debtor did not stand in a fiduciary relationship with the bank with respect to the proceeds from the sale of the bank's collateral, so that the failure to remit the proceeds to the bank did not provide a basis to except the resulting debt from discharge for debtor's fraud or defalcation while acting in a fiduciary capacity. The bank asserted that the security agreements signed by the debtor contained language that created a fiduciary relationship for purposes of § 523(a)(4). The terms of the security agreements required "all proceeds from

---

[5] *Davis v. Tomasek (In re Tomasek)*, 175 Fed.Appx. 662, 667 (5th Cir. 2006)(citing *In re Letterman Bros. Energy Sec. Litig.,* 799 F.2d 967, 975 (5th Cir. 1986)).

7

disposition of the Collateral" to be held in trust for the lender and not commingled with any other funds. The bankruptcy court explained that "fiduciary capacity" in § 523(a)(4) is intentionally narrow so that it does not apply to ordinary commercial relationships such as a debtor-creditor relationship. The court wrote that a majority of the courts hold that a security agreement does not create an express or technical trust required to except a debt from discharge under § 523(a)(4).

In *Board of Trustees v. Bucci (In re Bucci),* 2007 WL 1891736 (6th Cir. 2007), the board of trustees of a pension and fringe benefit plan filed a complaint against the debtor, the president and sole shareholder of a company that was required by the terms of a collective bargaining agreement to make monthly contributions to employee benefit funds, seeking to have the debt for unpaid employer contributions declared nondischargeable pursuant to § 523(a)(4). The Sixth Circuit held that the debtor's contractual obligation to pay the employer contributions was not sufficient to satisfy the fiduciary capacity requirement under § 523(a)(4). The Sixth Circuit explained that the key point for purposes of § 523(a)(4) is that the debtor "had only a *contractual* obligation to pay the employer contributions. This is not enough, for 'the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4).'"[6] The court of appeals further agreed with the bankruptcy court that "a breach of contract, without more, is not embezzlement" for purposes of § 523(a)(4).[7]

---

[6] *Board of Trustees v. Bucci (In re Bucci)*, 2007 WL 1891736 *7 (6th Cir. 2007).

[7] *Bucci*, 2007 WL 1891736 at *7.

8

In *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 296 F.3d 266 (4th Cir. 2002), the Fourth Circuit found that the debtors' obligation on their personal guarantees did fall within the discharge exception under § 523(a)(4) where the debtors' travel agency failed to place ticket-sales proceeds into a trust account and failed to report the sales that generated the proceeds. The court of appeals first noted that by simply guaranteeing the travel agency's debt to its creditor, the Chapter 7 debtor-officers did not place themselves in a fiduciary relationship with the creditor for purposes of § 523(a)(4). The court recognized that an ordinary security agreement does not create a fiduciary relationship between the debtor and creditor. But in this case there were three additional facts supporting a finding of breach of fiduciary duty under § 523(a)(4): (1) the debt owed by the travel agency arose out of the breach of a fiduciary relationship between the agency and the creditor under the parties' agreement; (2) the debtors, when acting as officers and directors of the travel agency, occupied a fiduciary relationship toward the agency under West Virginia law; and (3) the debtors were personally responsible for the conduct that gave rise to the defalcation. The debtors personally withheld money that was designated to be placed in trust for the creditor.

In the case before the Court, there is no evidence that a fiduciary relationship existed between Evabank and RHI or the debtor for purposes of § 523(a)(4). RHI purchased a mobile home from EvaBank and EvaBank financed the purchase. As noted by the Fourth Circuit in *Ellison* and the other cases above, an ordinary security agreement does not create a fiduciary relationship between a debtor and a creditor for purposes of § 523(a)(4). There is no evidence before the Court that the financing arrangement between RHI and EvaBank

9

Case 07-80025-JAC    Doc 23    Filed 08/17/07    Entered 08/17/07 13:07:26    Desc Main
Document    Page 9 of 14

was anything more than an ordinary security agreement which the debtor personally guaranteed.[8] As set out above, such creditor-debtor relationships are not fiduciary relationships for purposes of § 523(a)(4). Moreover, EvaBank admits that the debtor had, unbeknownst to EvaBank, sold half of the business and was no longer actively involved in running same. Plaintiff alleges no special facts over and above debtor's status as a shareholder and principal of RHI to support its claim that the debtor owed EvaBank a § 523(a)(4) fiduciary duty. Accordingly, the Court finds that the debtor did not stand in a fiduciary relationship with EvaBank with respect to the proceeds from the sale of EvaBank's collateral for purposes of § 523(a)(4). Instead, the Court finds that the relationship between the debtor and EvaBank was purely contractual.

Finally, the Court notes that EvaBank did not allege willful and malicious injury under § 523(a)(6) in its complaint. The complaint alleges loss "[a]s a result of Debtors' fraud, deceit, breach of contract and/or breach of fiduciary duty. . . ." None of the allegations contained in EvaBank's complaint even roughly parallel the elements required for a debt to be declared nondischargeable pursuant to § 523(a)(6) which reads as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt —
>
> * * * *
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

---

[8] *See Farmers and Merchants Bank v. Brinsfield (In re Brinsfield)*, 78 B.R. 364 (Bankr. M.D. Ga. 1987)(finding president and sole shareholder's signature as guarantor was not sufficient to impose a fiduciary duty upon debtor for purposes of § 523(a)(4)).

10

Nevertheless, the Court finds that the facts as alleged by EvaBank would not support a finding of willful and malicious injury for purposes of § 523(a)(6) had EvaBank plead same in its complaint.

For purposes of § 523(a)(6), the Eleventh Circuit has held "that a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[9] The Supreme Court further emphasized in *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) that the "word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." As for the term malice, the Eleventh Circuit has held that the term means "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[10]

Although corporate officers are not generally held personally liable for the debts of a corporation, they may be held liable to the extent that their participation in a tortious act results in harm to a third party. In two cases, the Eleventh Circuit has held that debts owed by a debtor as a corporate officer were non-dischargeable under § 523(a)(6) for failure to remit sales proceeds to secured creditors, but in both cases aggravating circumstances existed to show that the debtors willfully and maliciously injured the creditor.

---

[9] *In re Walker* 48 F.3d 1161, 1165 (11th Cir. 1995).

[10] *Id.* at 1164 (quoting *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir. 1989)).

11

In *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257 (11th Cir. 1988), the Eleventh Circuit affirmed a bankruptcy court's finding that a debtor, who substantially participated in the operation of a car dealership, had willfully and maliciously converted proceeds from the sale of twelve vehicles sold out of trust. The debtor argued that he could not be held responsible for conversion because he was not actively engaged in the operation of the dealership, but the Eleventh Circuit rejected this argument because evidence established the debtor's active and substantial participation in the dealership's operations. Moreover, the debtor actually received some of the converted sales proceeds from the cars sold out of trust. In *Ford Motor Credit Co. v. Owens (In re Owens),* 807 F.2d 1556 (11th Cir.1987), the Eleventh Circuit held that a corporate debt was nondischargeable under § 523(a)(6) in the personal bankruptcy of a corporate officer when the debtor actively participated in the conversion of cars by the corporation in which the debtor was a majority stockholder and president. The debtor made the decision to dispose of the cars and not turn the proceeds over to the creditor and was personally responsible for the day-to day operations of the dealership. The court concluded that the debtor was personally liable for the resulting injury to the creditor because of his official capacity with the dealership and his active participation in the conversion of the property subject to the creditor's security interest.

Although the Eleventh Circuit found that the secured creditors established willfulness and malice in both of these cases based on the aggravating circumstances shown, these cases do not stand for an inflexible rule that all sales out of trust are by definition willful and malicious. As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.*, 293
12

U.S. 328, 332 (1934), "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances." In *Davis,* the debtor borrowed money from the creditor in order to sell cars. He then sold a car without the creditor's written consent which was needed according to the parties' agreement. Instead of repaying the amount owed as required by the agreement, the debtor filed bankruptcy. The Supreme Court held that the sale, although a conversion, did not constitute willful and malicious injury to the creditor because no aggravating circumstances existed.

In this case, there are no aggravating circumstances that would give rise to a finding that the debtor is liable under § 523(a)(6) for willful and malicious conversion. RHI was overdrawn when RHI sold the mobile home. The proceeds from the sale of the mobile home were used by RHI to clear the overdraft and to continue running the business. The debtor did not actively participate in the conversion of the sales proceeds. In fact, the debtor signed a check prepared by RHI's secretary to pay EvaBank. The debtor was no longer involved, however, in running RHI on a daily basis and was unaware that there were insufficient funds in RHI's account to cover the check. The debtor signed the check with the understanding that same would be forwarded to EvaBank by his partner, Tom Collins, when the deposit from the sale of the mobile home cleared RHI's account. Subsequently, upon being informed by EvaBank that it had not received payment, the debtor contacted his partner to find out why. He was then informed that there were insufficient funds in the account to pay EvaBank, but the debtor still believed that Collins had accounts receivables coming in that would clear the check. Unlike the debtors in *Owens* and *Rehban,* there is no evidence in this case of the

13

Case 07-80025-JAC    Doc 23    Filed 08/17/07    Entered 08/17/07 13:07:26    Desc Main
Document    Page 13 of 14

debtor's active participation in the technical conversion of EvaBank's collateral. Accordingly, the Court finds that the debtor's actions in the present case do not rise to the standard of willful and malicious injury for purposes of § 523(a)(6) necessary to hold the debt nondischargeable.[11]

Dated: August 17, 2007

                                            /s/ Jack Caddell
                                            Jack Caddell
                                            U.S. Bankruptcy Judge

xc:    Debtor(s)
        John R. Lavette, attorney for plaintiff(s)
        Barry N. Brannon, attorney for defendant(s)
        trustee

---

[11] See also *In re Tomlinson*, 220 B.R. 134 (Bankr. M.D. Fla. 1998)(finding that debtor's failure to turn over inventory sale proceeds was not willful and malicious where the debtor reinvested the proceeds in the debtor's business and the debtor voluntarily surrendered remaining inventory to the creditor); and *In re Crump*, 247 B.R. (Bankr. W.D. Ky. 2000)( finding debtor's failure to remit proceeds subject to a security interest was not willful and malicious where the debtor's intent was to keep his business afloat, there was no evidence of intent to harm, and there was significant evidence of the debtor's good intent).

Case 07-80025-JAC    Doc 23    Filed 08/17/07    Entered 08/17/07 13:07:26    Desc Main
Document    Page 14 of 14